## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

ACR ENERGY PARTNERS, LLC

                          Plaintiff,

v.

POLO NORTH COUNTRY CLUB, INC.,

                         Defendant.

Civil Action No. 15-02677 (JBS)

---

## MEMORANDUM IN SUPPORT OF ACR ENERGY PARTNERS, LLC'S MOTION FOR ORDER TO SHOW CAUSE SEEKING TEMPORARY RESTRAINING ORDER

---

DLA Piper LLP (US)
17 Gordon's Alley
Suite 100
Atlantic City, New Jersey 08401

*Attorneys for Plaintiff,*
*ACR Energy Partners, LLC*

*Of Counsel and On the Brief:*
    Stuart M. Brown
    Timothy J. Lowry
    Richard A. Chesley (admission *pro hac vice* pending)

## INTRODUCTION

This action arises from the recent purchase by Polo North Country Club, Inc. ("Polo North") of the property formerly known as the Revel Atlantic City Hotel and Casino (the "Revel Casino"), and its unilateral decision to forego either a contract for, or payment of, energy services to provide electricity, hot and cold water and other energy services to the property. Indeed, Polo North decided in the chapter 11 bankruptcy proceedings of the former owner of the Revel Casino – Revel AC, Inc., *et al.* ("Revel") – to force the rejection of the long-term contract for energy services under the Energy Sales Agreement, and failed to even negotiate in good faith  toward an interim or long-term contract for such services. Now, with ACR Energy having properly terminated energy services to the Revel Casino, Polo North has made clear its plans to imminently and improperly use the energy equipment owned by ACR Energy and located within the Revel Casino to power the Revel Casino. Not only is such a wrongful interference with ACR Energy's property a wholesale derogation of the law, but it threatens to immediately cause irreparable damage to the unique and irreplaceable equipment contained within the energy distribution system.

Were these risks not enough, because of the dangers posed by the equipment in the energy distribution system, and the expertise and training required to safely operate the equipment, Polo North's attempt to connect generators to and operate

2

the equipment is likely to cause serious human injury or death.   Absent the entry of an appropriate order enjoining Polo North from interfering with or operating the energy distribution system or any of the equipment therein, both ACR Energy and the public will be imminently and irreparably harmed.

## STATEMENT OF FACTS

As set described in the Verified Complaint, this matter traces back to  April 2007, when as part for their construction of the Revel Casino, Revel issued a Request For Proposal ("RFP") soliciting proposals from providers to "Own, Design, Construct, Operate and Maintain" a complete Central Utility Plant ("CUP") to provide energy services to the Revel Casino  in Atlantic City. (Verified Complaint ¶ 9).  In return, Revel would enter into an agreement with the prevailing bidder to purchase utility services, including chilled water, hot water, and electricity as well as emergency standby power to be delivered to the hotel and the casino that Revel planned to construct in Atlantic City.  (*Id.*).

Following several years of negotiation and re-negotiation, Revel and ACR Energy entered into an Energy Sales Agreement on February 17, 2011 (the "ESA") under which ACR Energy agreed to design, construct, finance, and operate the CUP.   (*Id. ¶* 10).   The agreement was amended and restated twice —first on March 8, 2011 and later on April 11, 2011. (*Id*.).   Generally,  the  CUP  manages electricity received from Atlantic City Electric through a specially designed and

3

constructed substation owned by ACR Energy.  (*Id.* ¶ 11).  The only connection between the Revel Casino Property and the power grid  is through ACR Energy's CUP.  (*Id.*).  The CUP also generates electricity to serve Revel's needs, as well as providing hot water and chilled water. (*Id.*).

The production of energy and its transmission to the Revel Casino utilizes the infrastructure installed and largely owned by ACR Energy both in the CUP and inside the Revel Casino (the "ACR Energy Distribution System").    (*Id.* ¶ 12).  Inside the Revel Casino, ACR Energy owns a network of hot and cold water pipes, pumps, valves, and electrical equipment such as transformers, switchgears, and circuit breakers.    (*Id.*).  In the aggregate, ACR Energy owns approximately $40 million worth of assets and equipment within the Revel complex. (*Id.* ¶ 13).  The CUP also houses emergency diesel generators that are interconnected via paralleling switchgear to serve the CUP and the Revel building.   (*Id.*).   The generators have the capacity to permit the casino to remain fully operational and to allow the remainder of the complex to remain in a safe mode.

The CUP and the ACR Energy Distribution System were designed to Revel's specifications and contain equipment that was designed specifically for this system and, as such, is unique and irreplaceable. (*Id.* ¶ 14).   Moreover, the equipment contained within the ACR Energy Distribution System is extremely

dangerous and, if not handled and operated by trained ACR Energy personnel, is likely to cause serious and permanent human injuries, including death.  (*Id.* ¶ 15).

On June 19, 2014 (the "Petition Date"), Revel and its subsidiaries filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Since the Petition Date, and in fact for many months before, Revel  attempted to market and sell their assets, through a flawed and contentious sale process.  In the end, after submitting two earlier bids that had failed, the Bankruptcy Court entered the Order selling the Debtors assets to Polo North on April 6, 2015.  (*Id.* ¶ 16).  Due entirely to closing conditions of Polo North's own making, on or about April 7, 2015, the sale to Polo North from Revel closed pursuant to an Amended and Restated Asset Purchase Agreement dated March 20, 2015 (the "Amended Polo North APA"). (*Id.* ¶ 17).

From the inception of the sale process, which began even prior to the Petition Date, all parties, including Polo North were aware that the sole source of energy services to the Revel was through the CUP and pursuant to the ESA.  (*Id.* ¶ 18).  Nonetheless, at the direction of Polo North, on December 14, 2014, Revel filed in the Bankruptcy Court their *Motion for Entry of Order Rejecting Contracts with ACR Energy* [D.I. 1032].  The Rejection Motion made clear that Polo North "has elected not to have the ESA assumed and assigned to it in connection with such sale."   *Id* at 3.

5

Further, pursuant to Amended Polo North APA, there was no requirement for the Revel Debtors to ensure any continuity of energy services to Polo North following the closing, as the only obligation was: "All utility services that are available to the Revel Casino Hotel as of the date of this Agreement shall remain in effect in all material respects through the Closing Date . . ." *See* **Exhibit A**, § 10.6.

Notwithstanding Polo North's clear and unequivocal decision to acquire the Revel without any contract for energy services, for months, ACR Energy worked to try and accommodate Polo North, offering substantially discounted pricing for a transitional period to be followed by a long-term energy agreement. (Affidavit of Frank DiCola "DiCola Aff." (attached as **Exhibit B**) ¶19). Polo North rejected all efforts to arrive at an appropriate market agreement for energy services. (*Id.* ¶ 20). With no agreement for energy services and ACR Energy unwilling and unable to continue to provide such services at no cost, on multiple occasions, ACR Energy provided Polo North of its intention to terminate service. *See* Notice of Termination, **Exhibit C**. With Polo North refusing to provide any response, ACR Energy contacted the New Jersey Attorney General's Office for the Department of Gaming Enforcement, the Assistant City Solicitor for Atlantic City, an operations person at the Atlantic City Airport, the fire chief, the police chief, and others to ensure that the termination of energy services at the Revel Casino – which has been shuttered for nine months – would cause no public safety concerns. (DiCola

6

Aff. ¶ 26).    As no public official raised any concern, on April 9, 2015, ACR Energy terminated energy services to the Revel Casino.  (*Id. ¶* 27).

Not to be deterred, Polo North has continued in their efforts to obtain energy services to power the Revel Casino with 1400 rooms and 6 million square feet for **free or close to it.**  First, on April 10, 2015, Polo North filed a "Verified Complaint" and Order to Show Cause in the Superior Court of Atlantic County (Case. No. ATL-C-20-15) seeking a mandatory injunction to compel ACR Energy to provide energy services.  Despite the fact that this action had been removed to this Court, the Court denied the request of Polo North as they had failed to plead any cognizable cause of action.   (DiCola Aff. ¶32).

Thus, not being able to power the Revel Casino for free, Polo North has made clear its efforts to do the next best thing; attempt to power the Revel Casino by improperly and dangerously utilizing the ACR Energy Distribution System. Specifically, on or about April 9, 2015, ACR Energy began to learn from contractors in the field that Polo North was in the market to locate generators and contractors to connect these generators to electrical equipment located within the Revel Casino.  (DiCola Aff. ¶29).  Upon information and belief,  Polo North's CEO,   incorrectly represented to one or more of such equipment suppliers or contractors that the equipment to which the generators would be connected was

owned by Polo North.  (*Id.* ¶ 28).    Of course, the ESA could be no clearer that all of the ACR Energy Distribution System is property of ACR Energy.

On April 13, 2015, ACR Energy observed contractors entering the Revel Casino and delivering a small generator and learned that indeed Polo North was requesting these contractors to connect generators to the ACR Energy Distribution System. (*Id.* ¶¶ 31-32).  Later on April 13, 2015, a representative of ACR Energy received a telephone call from a representative of Polo North asking ACR to "tag out" its electrical lines into the Revel Casino in order that the contractors could connect the generators to the ACR Energy Distribution System.  (*Id.* ¶ 33).

Not only is Polo North clearly and unequivocally seeking to take possession and control of ACR Energy's property, but any attempt to circumvent highly complex and sophisticated equipment that was constructed to deliver a full range of energy services to the Revel Casino though the use of patched in generators and other unknown shortcuts poses an imminent risk to the ACR Energy Distribution System.  (*Id.* ¶ 14-15).  As critically, such a slapdash approach poses real and immediate threats to Atlantic City and its residents, from polluting, noisy and inefficient generators, to the real risk of a catastrophic accident from the unintended use of the ACR Energy Distribution System.  Accordingly, on April 13, 2015, ACR Energy notified each of the equipment suppliers and contractors suspected to be involved in providing generators or connection services that they

8

must immediately cease their efforts to not only circumvent ACR Energy's ownership rights, but potentially harm the residents of Atlantic City.  *See* **Exhibit D**.

## **ARGUMENT**

Federal Rule of Civil Procedure 65 authorizes the Court to enter a temporary restraint or preliminary injunction in order to preserve the status quo or protect the applicant from irreparable harm until a decision can be made on the merits of the underlying claims.  *See Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citation omitted).  Preliminary injunctive relief is warranted when (1) the movant shows a reasonable likelihood of success on the merits; (2) the movant is likely to suffer irreparable harm in the absence of the requested relief; (3) the threatened harm to the moving party outweighs any harm to the non-moving party; and (4) the public interest favors granting the requested relief.  *New Jersey Retail Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 385-86 (3d Cir. 2012).  This test requires the Court to "balance these four . . . factors to determine if an injunction should issue."  *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 2009) (quotation omitted).  For the reasons set forth below, ACR Energy has met every one of these criteria, and the requested injunctive relief should be entered accordingly.

**1.  ACR Energy Is Likely to Succeed on the Merits.**

In the Verified Complaint, ACR Energy asserts three causes of action against Polo North: (1) Trespass to Chattels (First Count);  (2) Conversion (Second Count) and (3) Public Nuisance (Third Count).   The uncontroverted facts demonstrate that ACR Energy is likely to succeed on the merits of all three claims.

**a.  ACR Energy Has a Likelihood of Success on its Claim for Trespass to Chattels.**

To state a claim for trespass to chattels under New Jersey law, a claimant must assert the following elements: (1) the plaintiff owns personal property; (2) with which the defendant has interfered or intermeddled; and (3) such that the value or condition of the property is impaired.  *Great Am. Ins. Co. v. Nicholas*, 1989 WL 125350, at *3 (D.N.J. Oct. 3, 1989).  Trespass to chattels does not limit itself to damage to chattels, rather "a trespass to a chattel may be committed by intentionally …intermeddling with a chattel in the possession of another." *Restatement (Second) of Torts. § 217* (1965).  ACR Energy's claim satisfies each of these requirements.

First, it beyond question that ACR Energy owns the ACR Energy Distribution System.  *See* ESA, Exhibit 1 to DiCola Aff.  Second, Polo North's attempts to connect to and operate the ACR Energy Distribution System without express or implied permission from ACR Energy constitutes interference with ACR Energy's ownership of the distribution system.  Third, any attempt by Polo

10

North to connect generators to, operate or use the ACR Energy Distribution System, in a manner that was wholly unintended, by representatives that are not trained to maintain, repair or operate the ACR Energy Distribution System will cause damage to the ACR Energy Distribution System by Polo North. (DiCola Aff. ¶ 15). These uncontroverted facts demonstrate that ACR Energy has a likelihood of success on the merits of this claim.

### b. ACR Energy Has Demonstrated a Likelihood of Success on its Claim for Conversion.

Under New Jersey law, conversion is "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alternation of their condition or the exclusion of an owners' rights. *LaPlace v. Briers,* 404 N.J. Super. 585 (App. Div. 2009); *Chicago Title Ins. Co. v. Ellis*, 409 N.J. Super. 444, 456, 978 A.2d 281, 288 (App. Div. 2009) (conversion is the "wrongful exercise of dominion or control over property of another without authorization and to the exclusion of the owner's rights in that property.").

Here, Polo North has already publicly and falsely claimed that the ACR Energy Distribution System is the properly of Polo North, and that in an effort to obtain energy services for free, third-parties are able to tamper with and use that system. (DiCola Aff. ¶¶ 31-32). By announcing its ownership of the ACR Energy Distribution System, tampering with, operating and interfering with the ACR Energy Distribution System, and excluding ACR Energy from possession of that

system, Polo North is likewise liable for conversion of property belonging to ACR Energy.

### c. ACR Energy Has Demonstrated a Likelihood of Success on its Claim of Public Nuisance

Finally,  ACR Energy is likely to prevail on its claims for public nuisance. "First, a public nuisance, by definition, is related to conduct, performed in a location within the actor's control, which has an adverse effect on a common right. Second, a private party who has suffered special injury may seek to recover damages to the extent of the special injury and, by extension, may also seek to abate." *In re Lead Paint Litig.*, 191 N.J. 405, 429, 924 A.2d 484, 499 (2007).

Here, it is clear that Polo North's efforts to bring energy services to the Revel Casino though generators and other unintended methods, pose the real and immediate risk of a public nuisance.  The use of generators, such as those planned to be installed by Polo North, is not in compliance with applicable laws and is "dirty energy".  DiCola Aff. ¶33.  Polo North has not applied for and will not secure the necessary licenses and permits to operate the temporary generators Polo North has ordered, especially in light of the "clean energy" that ACR is capable of delivering to the Complex and for which ACR holds all required permits and licenses.  *Id.*

12

### 2. ACR Energy Stands to Suffer Irreparable Harm Absent the Entry of a Temporary Restraint and Preliminary Injunction.

Polo North's  wrongful conduct justifies equitable relief and clearly satisfies the element of irreparable harm.  Not only will Polo North's designed conduct seriously and potentially permanently damage the ACR Energy Distribution System, but the consequences of Polo North's conduct could create severe and irreparable damage to Atlantic City,  its population and environs.  Generally "harm is considered irreparable in equity if it cannot be redressed by money damages," *Del. River & Bay Auth. v. York Hunter Constr.*, *Inc.,* 344 N.J. Super. 361, 365-69 (Ch. Div. 2001).  Certainly, the actions contemplated by Polo North pose risks that monetary damages cannot redress.

### 3. The Relative Equities Favor Entry of Injunctive Relief.

The balance of equities again clearly tips sharply in favor of ACR Energy's request for injunctive relief.  "Before granting an injunction, a district court must balance the relative harm to the parties, i.e., the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 597 (3d Cir. 2002) (Upholding preliminary injunction) (citations omitted).  Moreover, "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor." *Id.*  Here, the balance of the potential harm to ACR if injunctive relief is not issued

13

versus the potential harm to Polo North if such relief is issues clearly balances in favor of granting relief.

First, it cannot be ignored that Polo North voluntarily elected to close on the purchase of the Revel Casino with full knowledge for months of the need for energy services and that such services had been provided since construction by ACR Energy pursuant to the ESA.[1]  Not only did Polo North choose not to assume the ESA, which the Bankruptcy Code clearly allowed, but, despite the concerted efforts of ACR Energy to accommodate Polo North with discounted transition period pricing, it failed to engage in any reasonable negotiations toward even a short term energy services agreement.

And, even after it had assumed ownership of the Revel Casino, Polo North made no provision for energy services, even with notices that ACR Energy would no longer provide energy services for free or at rates below cost.  Rather than seek

---

[1] Indeed, as stated by this Court with respect to ACR Energy's motion for stay pending appeal of the January Polo North Sale Order:

> The situation is different with regard to ACR, whose power plant continues to function for the benefit of Debtors' property. It is logically and economically not conceivable that the purchaser, interested in maintaining and developing the premises, would evict ACR and plunge the project into darkness. This was acknowledged, if not promised, by counsel for Polo North at the hearing on this motion.

In re Revel AC, Inc., 525 B.R. 12, n.15 (D.N.J. 2015)  rev'd, No. ECO-013-E, 2015 WL 500704 (3d Cir. Jan. 29, 2015) and  on reconsideration in part, No. 14-22654 GMB, 2015 WL 567015 (D.N.J. Feb. 10, 2015).

any commercial arrangement, Polo North ran to New Jersey state court for relief that was not forthcoming.  And, with that route closed, again eschewing actually paying for energy services, launched a haphazard approach of providing energy services using the very same ACR Energy Distribution System that ACR Energy had used to provide services to the Revel Casino; albeit without paying a dime for the use of this multi-million dollar energy system.  Under these circumstances, with Polo North having provided no justification for its bad faith, ACR Energy is entitled to the relief sought from this Court.

### 4.  The Public Interest Favors Entry of the Requested Injunction.

Finally, the public interest strongly favors granting ACR Energy injunctive relief.  First and foremost, a hallmark of the public interest is the recognition and respect the law recognizes of  the ownership of private property.  *See Ne. Women's Ctr., Inc. v. McMonagle*, 665 F. Supp. 1147, 1159 (E.D. Pa. 1987) *aff'd in part and remanded*, 868 F.2d 1342 (3d Cir. 1989) (granting injunction against trespass based on the strong "public interest in protecting private property rights").  Polo North's unilateral attempts to seize the ACR Energy Distribution System and use it at **no cost** to power the Revel Casino, runs afoul of all notions of the public interest.

Moreover, Polo North's unilateral, unsupervised and ill-conceived strategy to power the Revel Casino using generators and other unknown equipment,

15

presents real and material risk to Atlantic City, as well as the men and women Polo North will have tampering with the ACR Energy Distribution System.  In this case, the public interest strongly favors granting of injunctive relief.  *See Marsellis-Warner Corp. v. Rabens*, 51 F. Supp. 2d 508, 532-33 (D.N.J. 1999) ("Where a party demonstrates both the likelihood of success on the merits and irreparable injury, 'it almost always will be the case that  the public interest will favor' the issuance of an injunction.") (quoting *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc*., 42 F.3d 1421, 1427 n.8 (3d Cir. 1994)); *see also Novartis* 290 F.3d at 597 ("we believe that where the plaintiff has demonstrated a likelihood of success on the merits, the public interest leans even more toward granting the injunction.")

## CONCLUSION

ACR Energy has established a strong likelihood of success on the merits, irreparable harm caused by Polo North's conduct,  that the balance of hardships tips greatly in its favor and that the public interest greatly favors the issuance of injunctive relief.  Accordingly, this Court should grant ACR Energy's application for Temporary Restraining Order and a Preliminary Injunction.

**WHEREFORE**, ACR Energy respectfully requests that the Court enter an order that:

(1)     Temporarily restrains Polo North from taking any action to tamper with, connect to, use, disturb or alter the ACR Energy Distribution System;

(2)     Directs Polo North to reimburse ACR Energy for any and all attorneys' fees, costs, and expenses incurred as a result of the wrongful conduct described herein, including such costs and fees incurred in this litigation; and

(3)     Grant such other and further relief as it may deem just and equitable.

**DLA Piper LLP (US)**
17 Gordon's Alley, Suite 100
Atlantic City, New Jersey 08401
(609) 449-7000
stuart.brown@dlapiper.com

By: _/s/ Stuart M. Brown_
        Stuart M. Brown

EAST\97672869.2